**Reina Izabel GARCIA–MARTINEZ, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–74068.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 2004.

Filed June 14, 2004.

Raymond A. Cardozo and Jayne E. Fleming (argued) of Reed, Smith, Crosby, Heafey LLP, Oakland, CA, for petitioner-appellant Reina Garcia–Martinez.

Peter Keisler, Mary Jane Candaux, and James E. Grimes (argued), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for respondent-appellee John Ashcroft, Attorney General.

Karen Musalo and Stephen M. Knight, U.C. Hastings College of Law, San Francisco, CA, for amicus curiae Center for Gender and Refugee Studies.

Before THOMPSON, TASHIMA, and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge:

Reina Garcia–Martinez (Garcia) has survived atrocities that most of us experience only in our worst nightmares. Her rural village in Guatemala was pillaged by both the guerillas and the military. Garcia's eventual rape was inextricably tied to the village's affiliation, in the minds of the Guatemalan military, with the guerillas. Because "[p]ersecution is stamped on every page of this record[,]" *Lopez–Galarza v. INS*, 99 F.3d 954, 959 (9th Cir.1996) (citation omitted), and the IJ's determination that Garcia failed to demonstrate past persecution is not supported by substantial evidence, we **GRANT** the Petition for Review and **REMAND** Garcia's case to the BIA, so that the agency can determine whether Garcia is eligible for asylum.

## I. FACTUAL BACKGROUND[1]

■ Garcia was born in the village of San Andres Villa Seca in Guatemala in

---

1. The facts are taken chiefly from Garcia's testimony before the IJ. Because the IJ expressly found Garcia's testimony credible, and the BIA did not make a contrary finding, we "accept the facts given by [Garcia] and the reasonable inferences to be drawn therefrom as true." *Zheng v. Ashcroft*, 332 F.3d 1186,

1189 n. 4 (9th Cir.2003) (citations omitted). We firmly reject the government's suggestion that when we accept a petitioner's testimony as true, we merely accept that the petitioner *believed* his or her testimony to be true. Under the government's theory, an IJ's positive credibility determination would be rendered

1973. Twenty to twenty-five families lived in the small, rural village. When Garcia was about nine years old, fighting between the Guatemalan military and insurgent guerillas spilled over into her village. At first, it appeared that the guerillas, rather than the military posed a greater threat to the villagers. The guerillas "would come at night and they would start knocking on the doors, they beat the people and most of all, they took the men[.]" They kidnapped approximately twenty people from the village—roughly "one man per family." Those who resisted the forced conscriptions were killed.

A year later, eight to ten guerillas came to Garcia's home seeking additional recruits. Although Garcia's father fought off the guerillas and managed to escape, the guerillas kidnapped her brother. Garcia's family has neither seen nor heard from her brother since that day. They did not report his abduction to the police "[b]ecause the guerillas said that if [they] told anything to the police, they were going to kill[her] brother."

A few years afterwards, the Guatemalan military, like the guerillas, began coming to the village. Although the villagers initially believed that the soldiers were there to protect them, the military soon began to beat the men, women, and children within the village. They also raped the women. Indeed, over the course of the next several years, someone in the village was raped by soldiers "[a]bout every 8 to 15 days." According to Garcia, the military targeted the village, and retaliated against its residents based on the mistaken belief that the villagers had voluntarily joined, and were thus attempting to aid, the guerillas.

The military's conduct went unchecked and largely unreported. The villagers were afraid to report the attacks because the soldiers threatened to kill them if they told the police. Even if a villager dared to make the two-hour trek to the nearest police station to report an attack by the military, the police rarely took action. In fact, rather than investigate a villager's complaint, the police would tell the military which villager made the report. The military would then carry out the murderous threats.

When Garcia was about sixteen years old, she saw firsthand what happened to those who reported military assaults. She woke up one morning to find, outside of a neighbor's house, "the bodies of eight people, men, women, and children, lined up on the ground, dead." According to the villagers, "someone in the family had reported an earlier attack by the military soldiers to the police, and ... the military soldiers had returned and killed the family."

When Garcia was nineteen, the violence invaded her home once again. Soldiers came at nine o'clock one night. They pounded on the door, waking the family, and demanding entrance. The soldiers forced their way into the house and began beating Garcia's father. Garcia "knew the men were military soldiers by the dark green and coffee colored clothing they wore" and the machine guns they all held. Garcia described what happened next:

> The military soldiers told my father not to speak or they would kill him. When my mother begged them to stop hitting my father, they began to hit my mother, too. The soldiers told my father that they wanted to eat and to be with a woman. When my mother and father tried to talk to the soldier, the soldiers would not listen and continued to hit my

meaningless. "Because no adverse credibility determination was made, and[Garcia's] tale in testimony was plausible, [her] story here must be accepted for purposes of assessing [her] entitlement to asylum." *Lopez v. Ashcroft*, 366 F.3d 799, 804 (9th Cir.2004) (citation omitted).

father until two of them took him outside and tied him up behind the back of the house. One of the soldiers came back inside of the house, told my mother that she had to cook food for them, and took her by force to the kitchen and made her cook food for them. While my mother was in the kitchen cooking food and my father was tied up, I was left alone with one of the soldiers. The soldier hit me with his gun and fists and then held my arms down while he raped me. When he was finished, the other two soldiers took turns raping and beating me.

Before the soldiers left, they told the family that if anyone revealed what they had done, they would return and hurt them again. When the soldiers left, they took the food Garcia's mother had cooked, as well as the family's flashlights and the gas they had for their lamps. After the soldiers left, Garcia and her mother went out back to untie her father, who was badly hurt and bleeding from the head.

Because her father was afraid that the soldiers would return if Garcia remained at home, he told Garcia to go to her aunt's house. Garcia made the thirty-minute trek while "hurt, bleeding, and ashamed." When she arrived at her aunt's house, they turned on all the lights so the military soldiers could not surprise them during the night. Because Garcia's aunt was afraid that Garcia had been followed by the soldiers, and that they would come to her house next, Garcia's aunt suggested that Garcia leave for the United States. Although no one in her family had ever gone to the United States, Garcia was afraid that the soldiers would hurt her again, or hurt her aunt. Consequently, once Garcia recovered from her injuries, she made her way to Mexico and then to the United States. She never returned home, and has not seen her family since she left Guatemala.

## II. PROCEDURAL BACKGROUND

In 1998, the Immigration and Naturalization Service ("INS") issued a Notice to Appear, alleging that Garcia was removable from the United States under the Immigration and Nationality Act § 212(a)(6)(A)(I), because she had entered the country without having been admitted or paroled. In lieu of removal, Garcia requested relief in the form of asylum, withholding of removal, relief under the Convention Against Torture, and voluntary departure.

When testifying before the IJ, Garcia recounted the use of forced conscription by the guerillas, including her own brother's kidnapping, as well as the Guatemalan military's resulting, but mistaken, belief that the villagers supported the guerilla movement. Garcia also detailed the systematic rapes committed by the military, and her own eventual rape. When asked why she thought she and her family had been assaulted by the soldiers, Garcia stated, "I think they were attacking us because the guerillas had taken my brother away, so they thought we were in favor of the guerillas." When asked in a follow-up question why she believed there was a connection between her brother's 1983 kidnapping and her 1993 rape, Garcia responded: "Because the guerillas continued to kidnap people from the town. So for the same reason, the military soldiers thought that all the persons that they took away, that they were in agreement with the guerillas."

In her oral decision, the IJ stated that Garcia had "testified sincerely and genuinely without hesitation" about her experiences in Guatemala. The IJ found Garcia's "testimony to be truthful" and considered her "a credible witness." Nevertheless, the IJ ruled that "the evidence in the record simply does not substantiate a finding that [Garcia] had been

a victim of past persecution[.] Particularly, [Garcia ] has failed to show ... that her attack had anything to do with ... her political opinion, her race, religion, her political affiliation or membership in a particular social group." To the IJ, Garcia's rape was simply "a criminal act that was committed against her by a soldier[,]" and there was no evidence that the rape was "condoned by the government" or that the individual who attacked Garcia could be considered a force the Guatemalan government was unable or unwilling to control.[2] The IJ also concluded that "[Garcia] has not shown any other evidence that any pro- or anti-government person, official or faction in Guatemala ... would have any present interest whatsoever in [her]." Consequently, the IJ determined that Garcia could not demonstrate a well-founded fear of persecution. In addition to finding that Garcia had failed to establish eligibility for asylum, the IJ found Garcia ineligible for withholding of removal or protection under the Convention Against Torture.

Garcia appealed the IJ's decision to the BIA, arguing that the IJ "erred in finding that there was no reasonable nexus" between Garcia's persecution and one of the five statutory grounds for asylum. Garcia also contended that the IJ erred in finding that she did not have a well-founded fear of future persecution. Finally, Garcia asserted that "the existence of compelling humanitarian reasons" warranted a favorable exercise of discretion in her case. The BIA affirmed the IJ's decision without opinion. This petition for review followed.

### III. ASYLUM STANDARDS

██ Garcia bears the burden of proof with respect to her claim of eligibility for asylum. *See* 8 C.F.R. § 208.13(a). An applicant for asylum must first show that he or she is a refugee. 8 U.S.C. § 1158(b)(1). A refugee is one "who is unable or unwilling to return to ... [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A).

██ "It is the well-settled law of this circuit that eligibility for asylum may be based on past persecution alone, even absent a well-founded fear of future persecution." *Lopez–Galarza*, 99 F.3d at 959 (citations and internal quotation marks omitted). For example, if an asylum applicant can show she has in the past "suffered under atrocious forms of persecution," she is eligible for asylum "even where there is little likelihood of future persecution." *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir.1993) (citations and internal quotation marks omitted); *see also Lal v. INS*, 255 F.3d 998, 1009 (9th Cir.2001) (recognizing that "sometimes past persecution is so horrific that the march of time and ebb and flow of political tides cannot efface the fear in the mind of the persecuted").

██ Rape or sexual assault may constitute such persecution. *See Lopez–Galarza*, 99 F.3d at 962 (observing that "[r]ape at the hands of government authorities ... can be an atrocious form of punishment indeed"). In such a case, the applicant "need only demonstrate the severity of [her] past abuse[,]" *Lal*, 255 F.3d at 1002, because "even though there may have been a change of regime in [her] country, this may not always produce a complete change in view of [her] past experiences, in the mind of the refugee." *Id.* at 1006 (citation and alterations omitted).

---

**2.** It appears that the IJ was under the mistaken impression that Garcia was raped by one man. However, Garcia clearly testified that she was gang-raped by three men.

■■ "Because it is difficult to conclusively prove motive, [Garcia] need only provide some evidence of motive, direct or circumstantial, and demonstrate the connection between the government's actions and [her] membership in a protected group." *Baballah v. Ashcroft*, 367 F.3d 1067, 1076 (9th Cir.2004) (citations, internal quotation marks, and alteration omitted) (emphasis in the original).[3] Garcia contends that she was persecuted based on the pro-guerilla political opinion imputed to her by the Guatemalan military. "The motive requirement is satisfied by evidence that political opinion was imputed to the petitioner." *Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir.2004) (citation omitted). Moreover, "[p]ersecution on account of imputed political opinion ... satisfies the motive requirement, whether or not that imputation is accurate." *Lopez-Galarza*, 99 F.3d at 959 (citation and emphasis omitted).

■■ We have cautioned that "[t]he difficulty of determining motive in situations of general civil unrest should not ... diminish the protections of asylum for persons who have been punished because of their actual or imputed political views ..." *Arulampalam v. Ashcroft*, 353 F.3d 679, 685 n. 4 (9th Cir.2003). And "the plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion." *Borja v. INS*, 175 F.3d 732, 735 (9th Cir.1999) (en banc) (citation and alteration omitted) (emphasis in the original). In other words, simply because the soldiers "might have had more than one motivation for raping

[Garcia] does not in itself defeat her asylum claim." *Shoafera v. INS*, 228 F.3d 1070, 1075–76 (9th Cir.2000).

■■ To demonstrate past persecution, "an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir.2000) (internal quotation marks omitted). To establish a well-founded fear of present persecution, an applicant must show that her fear is "both subjectively genuine and objectively reasonable." *Id.* at 656 n. 11 (citation omitted). "An applicant satisfies the subjective component by credibly testifying that [she] genuinely fears persecution." *Id.* (citation omitted). "The objective component of this test requires showing, by credible, direct, and specific evidence in the record, that persecution is a reasonable possibility." *Agbuya v. INS*, 241 F.3d 1224, 1228 (9th Cir.2001) (citation and internal quotation marks omitted). "This showing may be made by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." *Id.* (citation omitted). In fact, "an alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without the need for any corroboration." *Ladha v. INS*, 215 F.3d 889, 901 (9th Cir.2000).

■■ The ability to demonstrate past persecution triggers a rebuttable presumption of a well-founded fear of future persecution.[4] *Rios v. Ashcroft*, 287 F.3d

---

3. While Garcia "must provide some direct or circumstantial evidence that [she was] persecuted on account of political opinion, we have held persecution to be on account of political opinion where there appears to be no other logical reason for the persecution at issue."

*Rios v. Ashcroft*, 287 F.3d 895, 900 (9th Cir. 2002) (citation omitted).

4. The ability to demonstrate past persecution also triggers a rebuttable presumption "that internal relocation would not be reasonable[.]" 8 C.F.R. § 208.13(b)(3)(ii). The INS

895, 900 (9th Cir.2002) (citation omitted). However, "[t]he INS can rebut this presumption by showing, by a preponderance of the evidence, that the conditions in the applicant's home country have changed such that she no longer has a well-founded fear of persecution." *Id.* (citation omitted). Nevertheless, "a State Department report on country conditions, standing alone, is not sufficient to rebut the presumption of future persecution when a petitioner has established past persecution." *Molina–Estrada v. INS,* 293 F.3d 1089, 1096 (9th Cir.2002) (citations omitted). "Instead, we have required an individualized analysis of how changed conditions will affect the specific petitioner's situation." *Id.* (citation and internal quotation marks omitted).

As noted above, the BIA's streamlined decision affirmed, without opinion, the IJ's denial of Garcia's asylum application. "Because the BIA affirmed without opinion, the IJ's order constitutes the final agency determination that we review." *Halaim v. INS,* 358 F.3d 1128, 1131 (9th Cir.2004) (citation omitted). And because the IJ expressly determined that Garcia was a credible witness, we must "accept [Garcia's] testimony as true[.]" *Id.* (citation omitted). Therefore, "the question . . . becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief." *Ladha,* 215 F.3d at 900.

 The IJ's determination that Garcia is ineligible for asylum "can be reversed only if the evidence presented by [Garcia] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (cita-

tion omitted). To reverse the IJ's finding, we "must find that the evidence not only *supports* that conclusion, but compels it[.]" *Id.* at 481 n. 1, 112 S.Ct. 812 (emphasis in the original). To that end, the IJ's decision "need only be supported by substantial evidence." *Gonzalez–Hernandez v. Ashcroft,* 336 F.3d 995, 998 (9th Cir.2003) (citation omitted).

## IV. DISCUSSION

### A. Past Persecution

 The human rights abuses that took place during Guatemala's decades-long civil war have been well-documented. Indeed, "[a] UN sponsored truth commission estimated that as many as 200,000 people were killed during the 36–year war that ended in 1996." Testimony of Daniel Wilkinson, Human Rights Watch, before the Congressional Human Rights Caucus on October 16, 2003, at http://www.house.gov/lantos/caucus/Testimony-Wilkinson101603.htm (last visited May 10, 2004). "Government forces were responsible for the vast majority of the killings. Their victims were mostly unarmed civilians. Their methods were often extraordinarily cruel." *Id.*

The use of rape as one such method has also been well-documented. *See, e.g.,* Scott Splittgerger, THE NEED FOR GREATER REGIONAL PROTECTION FOR THE HUMAN RIGHTS OF WOMEN, 15 Wis. Int'l L.J. 185, 222 (1996) (detailing the systematic rape of women by the military in Guatemala)."The occurrence, or the realistic fear, of rape by members of military forces, in violation of international humanitarian law, is one of the factors contributing to the flight of women and their families from many situations of armed conflict." United Nations

---

can rebut this presumption by establishing, "by a preponderance of the evidence, that, under all of the circumstances, it would be reasonable for the applicant to relocate." *Id.*

This particular presumption is also triggered if "the persecutor is a government or is government-sponsored." *Id.*

High Commissioner for Refugees (UNHCR), NOTE ON CERTAIN ASPECTS OF SEXUAL VIOLENCE AGAINST REFUGEE WOMEN, at 7 (1993). "Besides being viewed by some in the military as a 'normal' by-product of war, sexual violence has also been used by armed forces ... as a means of intimidating a civilian population perceived to be in political opposition to the armed force in question." *Id.*

Consequently, the UNHCR has stated, "[t]here can be no doubt that when rape or other forms of sexual violence committed for reasons of race, religion, nationality, political opinion or membership of a particular social group is condoned by the authorities, it may be considered persecution[.]" *Id.* at 12. This Court has agreed with that conclusion. *See, e.g., Shoafera,* 228 F.3d at 1074; *see also Lopez–Galarza,* 99 F.3d at 962. Although we have held that "[r]ape is the kind of infliction of suffering or harm that may support a finding of past persecution," *Ochave v. INS,* 254 F.3d 859, 864 (9th Cir.2001), we have emphasized that an applicant must still demonstrate "that the rape was on account of a statutorily protected ground, such as an imputed political opinion." *Id.* (citation omitted).

Garcia credibly testified to the following facts: (1) approximately one man from each family in her village joined the guerilla movement, albeit involuntarily; (2) Garcia's brother was one of the villagers forcibly conscripted by the guerillas; (3) it was only after the guerillas began to use Garcia's village as a source for recruits that the Guatemalan military came to the village; (4) the military was under the mistaken belief that the villagers were guerilla sympathizers; (5) in retaliation for their perceived support, the military beat the villagers, whether men, women, or children, and systematically raped the women over the next several years; (6) villagers that reported these assaults were killed;

and (7) Garcia was one of the villagers eventually raped by the soldiers. Thus, Garcia detailed both her "personal experiences at the hands of the Guatemalan military" and "evidence of violence against [her] family and community[.]" *Chanchavac v. INS,* 207 F.3d 584, 589 (9th Cir. 2000). By testifying about the "prolific military violence" in her village, Garcia demonstrated that her own "attack was not an isolated incident." *Id.* at 590. These experiences "clearly constitute persecution as that term is defined." *Id.* at 589.

The IJ treated Garcia's personal experiences as if they had occurred in a vacuum, focusing on her brother's kidnapping and her rape a decade later in isolation, rather than examining the events in context. Although the IJ correctly noted that "[Garcia] testified that between the years 1983 when her brother was kidnapped until September of 1993 ... she and her family member [sic] had no problem whatsoever with the military of Guatemala[,]" this observation fails to take into account the brutality suffered by those around her during that same decade. The IJ also noted that the soldiers who raped Garcia "did not make any kind of reference whatsoever to her brother Mario while they were attacking the family."

By seizing upon the soldiers' failure explicitly to state why they were raping Garcia, the IJ appeared to require that Garcia provide *direct* evidence of the soldiers' motive, when we have consistently allowed circumstantial evidence to suffice. *See Gafoor v. INS,* 231 F.3d 645, 650 (9th Cir.2000) ("Because it is so difficult to prove motives with any precision ... an applicant does not have to provide direct evidence that [her] persecutors were motivated by one of the protected grounds; instead, compelling circumstantial evidence is sufficient") (citation omitted).

In addition to requiring direct evidence of motive, the IJ focused on only one possible motive—that the soldiers were punishing Garcia for her brother's forced alignment with the guerillas—when we have recognized that "many persecutors have mixed motives," *Grava v. INS*, 205 F.3d 1177, 1181 n. 3 (9th Cir.2000), and that "the protected ground need only constitute a motive for the persecution in question; it need not be the sole motive." *Navas*, 217 F.3d at 656 (citations omitted) (emphases in the original). Indeed, the IJ gave short shrift to additional, compelling evidence in the record that the village as a whole was targeted by the military for its perceived affiliation with the guerilla movement. While the indiscriminate nature of the military's assaults may undermine Garcia's belief that she was targeted specifically because of her brother, it bolsters her theory that the soldiers attacked her because she belonged to a village they considered a guerilla stronghold. That the military may not have known about Garcia's brother does not preclude another motive ignored by the IJ—the soldiers systematically targeted everyone in the village. It was only a matter of time until Garcia became the individual target of the systematic abuse of the villagers.

 The government also focuses on only one potential motive for Garcia's rape, namely, the soldiers' stated reason for the assault—that they wanted "to be with a woman" and thus satisfy their "unlawful, violent, carnal desire." Mixed motives, however, do not defeat an asylum claim. *See Shoafera*, 228 F.3d at 1075–76 (holding that applicant's testimony that government official "might have raped her because he thought she was attractive" did not defeat claim where applicant also testified that she was persecuted, in part, because of her ethnicity). Indeed, "[p]ersecutors do not always take the time to tell their victims *all* the reasons they are being beaten, kidnapped, or killed." *Gafoor*, 231 F.3d at 650 (emphasis added). Thus, the fact that the soldiers failed explicitly to inform Garcia that they were raping her on account of a protected ground is *not* highly relevant. Indeed, to rely solely upon, and insist that an asylum applicant be bound by, a persecutor's own statements regarding motive would be patently unreasonable.

Furthermore, the DOJ's argument simply perpetuates the myth that "[r]ape is just forceful sex by men who cannot control themselves[.]" Margaret A. Cain, THE CIVIL RIGHTS PROVISION OF THE VIOLENCE AGAINST WOMEN ACT, 34 Tulsa L.J. 367, 407 n. 32 (1999) (citation omitted). In reality, "[r]ape is not about sex; it is about power and control." *Id.* This observation is especially trenchant when viewed in the context of war, where rape may be used to intimidate "a civilian population perceived to be in political opposition to the armed force in question." UNHCR, NOTE ON CERTAIN ASPECTS OF SEXUAL VIOLENCE AGAINST REFUGEE WOMEN, at 7; see also Kelly D. Askin, PROSECUTING WARTIMERAPE AND OTHER GENDER-RELATED CRIMES UNDER INTERNATIONAL LAW, 21 Berkeley J. Int'l L. 288, 297 (2003) ("Indisputably, rape and other forms of sexual violence are used as weapons of war").

The government also contends that Garcia made "the tortured leap in logic that because her brother was kidnapped in 1983 by guerillas ... 'the military' raped her in 1993." As discussed above, however, Garcia also testified that nearly every family in the village lost a man to the guerillas, and that the military targeted the entire village, raping a woman every eight to fifteen days, based on its mistaken belief that the villagers had voluntarily joined the opposition. Thus, Garcia posited an alternative, and reasonable, theory regarding her persecutors' motives. *See Gafoor*, 231 F.3d at 650 (observing that "an applicant need only produce evidence

from which it is *reasonable* to believe that the harm was motivated, at least in part, by an actual or implied protected ground") (citation and internal quotation marks omitted) (emphasis added). Indeed, the fact that, like many other villagers, Garcia's brother was kidnapped and Garcia later raped, simply strengthens her claim. The particular facts of her case merely illustrate the events that took place throughout the entire village, and the repercussions that the villagers suffered as a result.

Consequently, the IJ's determination that Garcia's rape was a random criminal act, unconnected to the government, is not supported by substantial evidence. Garcia's credible testimony demonstrated that the women in her village were systematically raped by the Guatemalan military— assaults that were part of an orchestrated campaign to punish a village erroneously perceived as a guerilla stronghold. The evidence presented by Garcia not only supports that conclusion, it compels it. *See Elias–Zacarias*, 502 U.S. at 481 n. 1, 112 S.Ct. 812.

## B. Future Persecution

■ When testifying before the IJ, Garcia stated that after she fled to the United States, "everyone in [her ] village left and moved away ... because they were afraid of the soldiers who continued to come into people's homes and rape girls and take them away from their families." As a result, Garcia no longer knows anyone who lives in her village, and believes "there is no one there to protect [her] from another attack by the soldiers." Garcia is also "ashamed to return to[her] village" because of her rape, and believes that "just seeing the military would make [her] re-live" the assault. Nor does resettlement in Nuevo Amanecer, a crime-ridden shantytown where her family now lives, and where her brother-in-law was recently murdered, offer her a safe haven given

that "the police do nothing to protect the people" living there. According to Garcia, "the government wants to relocate the people in Nuevo Amanecer to El Peten," a guerilla controlled area near the Mexico–Guatemala border. "Because the guerillas took over El Peten[,]" Garcia fears "that there will be guerillas or military soldiers there ... and that [she] will be attacked again." In short, Garcia maintained, "I do not have a safe place to go back to in Guatemala."

By credibly testifying that she genuinely feared persecution, Garcia satisfied the subjective component of the "well-founded fear" determination. *See Navas*, 217 F.3d at 656 n. 11. Nevertheless, the IJ noted, Garcia also testified that "since her departure from Guatemala in 1993[,] the military or the soldiers in Guatemala have never revisited her parents, either at her birthplace where she was attacked or the new place where her family is currently residing." Consequently, the IJ found that "[Garcia] has not shown any other evidence that any pro- or anti-government person, official or faction in Guatemala ... would have any present interest whatsoever in[her]."

Therefore, the IJ held, Garcia failed to demonstrate that she had a well-founded fear of persecution.

The IJ appeared to hold that "because [Garcia ] had not established past persecution, [she] was not entitled to a regulatory presumption of a well-founded fear of future persecution; and that because the facts adduced did not independently and objectively support this claim, it must fail." *Jahed v. INS*, 356 F.3d 991, 996 (9th Cir. 2004). Nevertheless, recent reports reflect that "seven years after the signing of peace accords, Guatemala has made little progress toward securing the protection of human rights and rule of law that are essential features of a functioning democ-

racy." Testimony of Daniel Wilkinson, Human Rights Watch, before the Congressional Human Rights Caucus, at http://www.house.gov/lantos/caucus/Testimony-Wilkinson101603.htm (last visited May 10, 2004). Accordingly, "the significance of political change in Guatemala [is] a highly complex and sensitive matter." *INS v. Ventura,* 537 U.S. 12, 17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002). Therefore, we must give "the BIA the opportunity to address the matter in the first instance in light of its own expertise." *Id.; see also Gonzalez–Hernandez,* 336 F.3d at 1000 ("[T]he agency, not a court of appeals, must construe the country report and determine if country conditions have changed such that the applicant no longer has a well-founded fear of persecution").

Because neither the IJ nor the BIA determined whether country conditions have changed such that a presumption of future persecution is rebutted, we may not do so in the first instance. *Ventura,* 537 U.S. at 14, 123 S.Ct. 353. Thus, although we hold that Garcia has suffered past persecution, thereby triggering a rebuttable presumption of a well-founded fear of future persecution, we must remand Garcia's case to the BIA, so that the agency may determine whether current conditions in Guatemala sufficiently overcome that presumption. *See id.* at 16, 123 S.Ct. 353 (holding that if the BIA has not made findings on an issue of fact, "the proper course ... is to remand to the agency for additional investigation or explanation") (citations omitted).

Remand is also necessary to determine if, pursuant to the humanitarian exceptions of 8 C.F.R. § 1208.13(b)(1)(iii)(A)-(B), Garcia's past persecution alone renders her eligible for asylum. Although Garcia argues to this Court that she is entitled to a discretionary grant of asylum for humanitarian reasons, and raised the issue, to a degree, in her brief to the BIA, the IJ did

not consider the issue and we may not examine it in the first instance. *Ventura,* 537 U.S. at 14, 123 S.Ct. 353.

## C. The BIA's Summary Affirmance

 Pursuant to 8 C.F.R. § 1003.1(e)(4)(I), a single member of the BIA may affirm without opinion "if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or (B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 1003.1(e)(4)(i)(A)-(B).

Because the IJ's decisions were not based on discretionary factors, we have jurisdiction to review the merits of Garcia's asylum claim, and, therefore, jurisdiction to review the BIA's streamlining decision. *See Falcon Carriche v. Ashcroft,* 350 F.3d 845, 855 (9th Cir.2003). "However, such review would be unnecessary and duplicative." *Id.* "If the BIA streamlines a case, the IJ's decision becomes the final agency decision, and the regulatory scheme gives us a green light to scrutinize the IJ's decision as we would a decision by the BIA itself. The decision to streamline becomes indistinguishable from the merits." *Id.* "Thus, where we can reach the merits of the decision by the IJ ... an additional review of the streamlining decision itself would be superfluous." *Id.* (citations omitted). Because we can reach the merits of the IJ's decision in this case, we need not, pursuant to *Falcon Carriche,* review the BIA's decision to streamline. *Falcon Carriche* also forecloses Garcia's argument that the BIA's streamlining de-

cision denied her due process of law. *See id.* at 850–51.[5]

## V. CONCLUSION

Because the IJ's denial of asylum was not supported by substantial evidence, we **GRANT** the Petition for Review and **REMAND** Garcia's case to the BIA for a determination whether Garcia is eligible for asylum or other relief.

**PETITION GRANTED.**

---

**5.** In addition to finding that Garcia failed to establish eligibility for asylum, the IJ also ruled that Garcia was ineligible for withholding of removal or protection under the Convention Against Torture. Garcia did not appeal these claims to the BIA, and as a result we do not have jurisdiction to address them. *See Vargas v. INS,* 831 F.2d 906, 907–08 (9th Cir.1987) ("Failure to raise an issue in an appeal to the BIA constitutes a failure to exhaust remedies with respect to that question and deprives this court of jurisdiction to hear the matter") (citations omitted).