**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GAREGIN KAMALYAN,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney General,

*Respondent.*

No. 05-76408

Agency No.
A096-155-948

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 8, 2010—San Francisco, California

Filed August 25, 2010

Before: Cynthia Holcomb Hall, John T. Noonan and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Noonan;
Dissent by Judge Hall

12831

**COUNSEL**

Jerry Wolf Stuchiner, Paladinlaw, Las Vegas, Nevada, for petitioner Garegin Kamalyan.

Carol Federighi, Senior Litigation Counsel, U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, DC; Ronald E. LeFevre, Department of Home-

land Security, San Francisco, CA; Gregg I. Malawer, U.S. Department of Justice, Washington, DC; William Clark Minick, Trial Attorney, U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, DC; Erica Miles, U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, DC, for respondent Eric H. Holder, Jr.

## OPINION

NOONAN, Circuit Judge:

Garegin Kamalyan, a Jehovah's Witness, petitions for review of the Board of Immigration Appeals ("BIA") adopting and affirming the decision of the immigration judge ("IJ"). We grant the petition and remand.

### *FACTS*

Kamalyan is a native of the U.S.S.R. and a citizen of Armenia. He applied for asylum on November 11, 2002, claiming religious persecution based on his status as a Jehovah's Witness.

Kamalyan's asylum application was premised upon two encounters with Armenian law enforcement in August 2001 and May 2002. In the first encounter, Kamalyan and four other Jehovah's Witnesses had gathered in his apartment to read and interpret the main book of their faith. Five police officers entered and began searching the apartment, confiscating the religious literature they found. When Kamalyan protested, one officer punched him in the face. The officers detained Kamalyan and his associates and transported them to a police station for interrogation because their activities were considered proselytizing forbidden by Armenian law. At the police station, the officers interrogated Kamalyan for three to

four hours while punching him and beating him with sticks. After twelve hours of detention, he was released after his parents paid $1000 as a bribe.

In the second encounter, Kamalyan and another Jehovah's Witness were proselytizing near a university. Four police officers told them that "the law in Armenia forbade proselytizing except by the official church" and detained them separately. The officers interrogated Kamalyan and beat him when he refused to answer questions. After three to four hours, the officers offered to drop the criminal charges against him in exchange for a bribe of $1500. Kamalyan's father brought the bribe the following day, and the officers released Kamalyan.

## PROCEEDINGS

The IJ found Kamalyan's testimony to be credible and concluded that he had suffered past persecution on account of his religion. "This raises the presumption," the IJ continued, "that [he] would continue to have a well-founded fear of persecution if he returned to Armenia. That presumption may be rebutted by changed country conditions."

Kamalyan provided some testimony about current conditions in Armenia. Portions of this testimony indicated that conditions had improved. His religion was "legalized" or "became official" approximately one month before the hearing. The IJ asked if he knew whether Jehovah's Witnesses could now legally proselytize. He answered, "Should be, because the faith itself is legal now." Despite these changes, Kamalyan stressed that he would be persecuted if he returned to Armenia, explaining, "[Armenia] accepted that law to be able to join the European Union; but it is only on paper." He testified that law enforcement still arrested Jehovah's Witnesses for proselytizing: "I'm very sure, I'm positive that such things are still going on in Armenia."

The IJ began her oral decision by declaring:

> General evidence of changed country conditions, which does not relate specifically to the [applicant's] situation, may not overcome detailed and specific testimony by the [applicant] regarding conditions in the country of origin. In this case, the [applicant's] testimony about current conditions in Armenia was not detailed and specific.

The IJ continued: "Because the [applicant's] testimony was somewhat vague with regard to very recent current conditions in Armenia, the Court may look to general background documents for an explanation of those conditions."

The IJ then reviewed two U.S. State Department country reports on Armenia titled *International Religious Freedom Report 2004* ("*2004 Report*") and *Country Reports on Human Rights Practices 2003* ("*2003 Report*"). From these reports, the IJ drew several conclusions. First, Jehovah's Witnesses now had the ability to register as a recognized religion in Armenia. Second, any ban on proselytizing "was not enforced, and all denominations, including Jehovah's Witnesses, could advocate their point of view." The IJ also found that "there are no longer problems in renting meeting places for Jehovah's Witnesses" and they "are allowed to bring in small quantities of printed materials for their own use." The IJ believed this information to be "relevant to [Kamalyan's] case because he indicated that his group of Jehovah's Witnesses had to meet in private homes because they were unable to rent a meeting place and that his first arrest was precipitated by the finding of small quantities of printed material from the Jehovah's Witnesses in his own home." Finally, the IJ noted that Armenia had passed a law accommodating conscientious objectors to military service.

From these facts, the IJ concluded that Kamalyan's fear of mistreatment by the police was no longer reasonable. The BIA adopted and affirmed the IJ's decision.

*ANALYSIS*

We review the denial of asylum for substantial evidence and uphold the denial if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Li v. Holder*, 559 F.3d 1096, 1102 (9th Cir. 2009). Findings of fact are conclusive unless "any reasonable adjudicator" would be compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B).

The IJ found Kamalyan to be credible and concluded that he had demonstrated past persecution on the basis of religion. This created a presumption that he had a well-founded fear of future persecution and was eligible for asylum, which could be rebutted only if the government demonstrated—by a preponderance of the evidence—that a fundamental change in country conditions dispelled any well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1); *Deloso v. Ashcroft*, 393 F.3d 858, 863-64 (9th Cir. 2005).

**[1]** We agree with the IJ that Kamalyan's testimony about current conditions in Armenia was unilluminating. We turn, then, to the country reports.

**[2]** Our circuit has reiterated that "a State Department report on country conditions, standing alone, is not sufficient to rebut the presumption of future persecution when a petitioner has established past persecution." *Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1074 (9th Cir. 2004) (quoting *Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002)). Such reports are often "the most appropriate and perhaps the best resource for information on political situations in foreign nations." *Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008). Nonetheless, they typically are not amenable to an "individualized analysis" tailored to an asylum applicant's particular situation. *See, e.g.*, *Garcia-Martinez*, 371 F.3d at 1074; *Lopez v. Ashcroft*, 366 F.3d 799, 805 (9th Cir. 2004).

**[3]** The country reports indicated that Jehovah's Witnesses had obtained the ability to register as a recognized religion in Armenia. No evidence explained the meaning or significance of this event. The *2004 Report* found "no overall change in the status of respect for religious freedom" in Armenia. Both Reports confirmed that even officially recognized religions were prohibited from proselytizing in Armenia. While the *2003 Report* advised that the ban was not enforced, the *2004 Report* recounted that complaints were lodged against Jehovah's Witnesses "for proselytizing" and "some official warnings sent to Jehovah's Witnesses because of proselytizing activities."

Armenia's attempt to accommodate Jehovah's Witnesses' objections to military service is not germane to the persecution experienced by Kamalyan. As the dissent acknowledges, "[a]t no time has Kamalyan claimed he was persecuted for refusing conscription." The IJ's reliance on this aspect of the reports evinces an analysis that strains to appear "individualized."

**[4]** Overall, the country reports were expressly inconclusive regarding the significance or permanence of the improvements identified by the IJ. The *2004 Report* summarized:

> There was no overall change in the status of respect for religious freedom during the period covered by this report. According to legislation passed in November 2003, the Law on Alternative Military Service took effect on June 1, but had not been implemented by the end of the period covered by this report. . . . In June, the Government again denied the Jehovah's Witnesses application for formal registration as a religious organization. The registrar's office cited technical problems with the application. Other denominations occasionally report acts of discrimination, usually by mid-level or lower level government officials.

Similarly, the *2003 Report* concluded:

> The Government's human rights record remained poor; although there were some improvements in a few areas, serious problems remained. . . . Security forces beat pretrial detainees. Impunity remained a problem. There were reports of arbitrary arrest and detention. Lengthy pretrial detention remained a problem. . . . The law placed some restrictions on religious freedom. The Government continued to deny registration to and detain Jehovah's Witnesses.

**[5]** "Any reasonable adjudicator" would agree that the government did not establish a fundamental change in country conditions by a preponderance of the evidence. We grant Kamalyan's petition for review. We remand the matter to the BIA with instructions to remand for further proceedings as to whether a fundamental change in country conditions has overcome the presumption that Kamalyan has a well-founded fear of future persecution. The dissent references the 2005 Country Report and the 2010 Country Report to show that Kamalyan faces no danger. Those reports were not before the IJ or the Board. On remand, they may be properly considered.

**PETITION GRANTED**; **REMANDED**.

HALL, Circuit Judge, dissenting:

I believe a fair reading of the evidence before the Immigration Judge ("IJ") supports her findings that country conditions in Armenia had "fundamentally changed" between 2002 and 2004 for Jehovah's Witnesses who, like petitioner Garegin Kamalyan, were persecuted in the past for proselytizing, and that petitioner no longer has a "well-founded fear of future persecution." I disagree with the majority that any reasonable

adjudicator would be compelled to reach a contrary conclusion. Accordingly, I respectfully dissent.

## I.

In ruling on the petition in this case, the IJ found that Kamalyan, a Jehovah's Witness and citizen of Armenia, had suffered "past persecution" on account of his religion, based on two incidents of beatings by Armenian police in 2001 and 2002 while in detention after being arrested for "proselytizing" in violation of Armenian law. The IJ specifically found Kamalyan to be credible, and found his showing of past persecution sufficient to gave rise to a presumption of a "well-founded fear of future persecution." *See Zehayte v. Gonzales*, 453 F.3d 1182, 1185 (9th Cir. 2006). The IJ found the presumption of future persecution rebutted, however, by Kamalyan's own testimony and two U.S. State Department reports—*Armenia: International Religious Freedom Report 2004* (Sept. 15, 2004) ("2004 Religious Freedom Report"), and *Armenia: Country Reports on Human Rights Practices — 2003* (Feb. 25, 2004) ("2003 Human Rights Report") —which indicated that the status and official treatment of Jehovah's Witnesses and other minority religions in Armenia had fundamentally changed by the time of the hearing on the petition on November 24, 2004. The BIA adopted and affirmed the decision of the IJ because "the country information in the record . . . confirms improved conditions for Jehovah's Witnesses[,] . . . the evidence of improved country conditions went unrebutted, and . . . [Kamalyan] consequently has failed to meet his burden of proof for eligibility for asylum, withholding of removal, and relief pursuant to the Convention Against Torture."

## II.

We review a denial of asylum eligibility for substantial evidence and must uphold the denial if it is supported by reasonable, substantial, and probative evidence on the record

considered as a whole. *Li v. Holder*, 559 F.3d 1096, 1102 (9th Cir. 2009); *Zehayte*, 453 F.3d at 1185. "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). "This 'strict standard' precludes us from 'independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown.' " *Gu v. Gonzales*, 454 F.3d 1014, 1018-19 (9th Cir. 2006) (quoting *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir.1994)).

In order to meet its burden of proving a fundamental change of circumstances, the government is "obligated to introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution." *Popova v. INS*, 273 F.3d 1251, 1259 (9th Cir. 2001). Where past persecution has been established, *generalized* information from a State Department report on country conditions is not sufficient to rebut the presumption of future persecution. *Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002) (emphasis added). However, an analysis of changed country conditions tailored to the petitioner's individual claims of persecution is sufficient to rebut the presumption. *Gonzalez-Hernandez v. Ashcroft*, 336 F.3d 995, 997-1000 (9th Cir. 2003); *see also Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008) (rejecting petitioner's argument that State Department country reports are "generalized materials" that are insufficient to rebut a presumed well-founded fear of future persecution).

## III.

In concluding that the evidence before the IJ did not establish a fundamental change in conditions for Jehovah's Witnesses in Armenia, the majority brushes aside Kamalyan's testimony, and considers only the two country reports issued by the State Department in 2004. The majority then proceeds

to discount the information from the 2003 Human Rights
Report and the 2004 Religious Freedom Report on which the
IJ relied, describing them as "inconclusive." Maj. Op. at
12838. I believe the majority misapprehends the IJ's decision
and misapplies relevant Ninth Circuit law.

First, the majority suggests that Kamalyan's testimony at
the November 2004 hearing provides no support for the IJ's
decision. Although the IJ commented that Kamalyan's testi-
mony was "somewhat vague," and that he did not have any
"specific information" about the "very recent current condi-
tions" in Armenia,[1] she did credit testimony in which he "ad-
mitted that he [was] aware that it became 'legal' to be a
Jehovah's Witness in Armenia within approximately the past
month." Kamalyan's testimony on this point was that the
Jehovah's Witness religion had become "legal" about a month
before the hearing, and he said he knew this because "it was
announced on TV that [his] religion had been officially
allowed in the country," and that he had read on the Internet
that "Jehovah's Witness is now a recognized religion" in
Armenia. Kamalyan added that he believed it was thereafter
legal for Jehovah's Witnesses to proselytize in Armenia.
Relying on the 2004 Religious Freedom Report, the IJ took
notice of "the change in the ability of Jehovah's Witnesses to
register as a recognized religion in Armenia," and the fact that
Armenian Jehovah's Witnesses had "expressed satisfaction
that they were making progress towards registration."

To be sure, the IJ did not give great weight to Kamalyan's
testimony for the reasons stated, but also because he, a non-
lawyer, did not seem to have a clear understanding of what it

---

[1]For example, when the IJ inquired about the factual basis for his belief
that "law enforcement [was] still arrest[ing] Jehovah's Witnesses for
proselytizing," Kamalyan candidly admitted he had no personal knowl-
edge of any facts to support that claim, saying: "I don't know anybody
who has been arrested during the last [month], personally; but I'm very
sure, I'm positive that such things are still going on in Armenia."

meant that the Jehovah's Witness religion was now "legal."[2] In fact, however, Kamalyan was correct that the Armenian government had already granted the Jehovah's Witnesses formal registration as a religion in October 2004. *See* U.S. Dept. of State, *Armenia: International Religious Freedom Report 2005* (Nov. 8, 2005) ("2005 Religious Freedom Report") at 3.[3] As a result, Armenian Jehovah's Witnesses were thereafter free to publish newspapers or magazines, rent meeting places,[4] broadcast programs on television or radio, and officially sponsor visas for visitors. *Id.*; *see also* 2004 Religious Freedom Report at 3. Whereas Armenian Jehovah's Witnesses had previously been able to import only "small quantities of printed materials for their own use," they were also, as of and after October 2004, allowed to import large quantities of religious materials. *Id.*[5]

---

[2]For example, the IJ noted Kamalyan's opinion that "the recent change [did] not make any difference to his situation," because "it was always on paper legal to be a Jehovah's Witness but that still they were persecuted in Armenia."

[3]We have previously taken judicial notice of creditable, well-publicized accounts of changes in country conditions occurring after the BIA decision —albeit in a case where conditions had significantly worsened while the appeal was pending. *Gafoor v. INS*, 231 F.3d 645, 654-56 (9th Cir. 2000), *superseded by statute on other grounds as stated in Parussimova v. Mukasey*, 555 F.3d 734, 739-40 (9th Cir.2009). Of course, we may not determine the issue of changed country conditions in the first instance, *INS v. Ventura*, 537 U.S. 12, 16 (2002), but there is no reason to ignore State Department country reports that merely confirm that the "changed conditions" found by the IJ continued to unfold as the IJ believed they would— i.e., in the direction of expanded religious freedoms for Armenian Jehovah's Witnesses in general, and for Kamalyan in particular.

[4]As the IJ found, this new freedom was especially relevant to Kamalyan's case because he indicated that his group of Jehovah's Witnesses had to meet in private homes because they were unable to rent a public meeting place. Indeed, his first arrest was precipitated when the police found small quantities of printed religious materials during a meeting in his home, which he said was for personal use even though he admitted he was also proselytizing at the time.

[5]In addition, the IJ found that the "official attitude" toward Jehovah's Witnesses had improved even before the registration process was com-

On the other hand, Kamalyan was not correct in believing that the 1991 ban on proselytizing was lifted as to Jehovah's Witnesses after they obtained official recognition from the Armenian government, as the ban technically applied and continues to apply to *all religious groups* in Armenia—albeit with phrasing that appears to exempt the national religion, that of the Armenian Apostolic Church. *See* 2004 Religious Freedom Report at 3. As stated in the 2003 Human Rights Report, however, the proselytizing ban was not being enforced at the time of the hearing, and "all denominations, including Jehovah's Witnesses, could advocate their point of view."[6] *Id.* at 8. Moreover, except for a report of a few "official warnings" to individual Jehovah's Witnesses regarding their "illegal" proselytizing activities, there was no evidence of any detentions or active prosecutions of Jehovah's Witnesses for violating that law. 2004 Religious Freedom Report at 5. That religious freedoms for Armenian Jehovah's Witnesses (including, arguably, their freedom to proselytize) had already improved by the time of Kamalyan's hearing is reinforced by the fact that they were the only religious minority to claim an increase in the number of adherents—from approximately 7,500 to 8,500 between September 2004 and November 2005—as a result of their "missionary program." *Compare* 2004 Religious Freedom Report at 2, *with* 2005 Religious Freedom Report at 2.

As the majority notes, the 2003 and 2004 country reports admitted into evidence during the hearing do contain some bits of information that cut against the IJ's finding of changed country conditions—as the majority highlights by selectively

---

pleted. Specifically, during the year prior to the hearing, there were no reports of Jehovah's Witnesses losing their jobs because of their religion, as they had in the past; and there was no officially sponsored violence or harassment of Jehovah's Witnesses during the reporting period. *See* 2004 Religious Freedom Report at 4-5.

[6]Indeed, the proselytizing ban remains on the books to this day, but is *still* not being enforced. *See Armenia: Country Reports on Human Rights Practices – 2009* (Mar. 11, 2010) at 27.

quoting from very general, introductory passages in the two reports.[7] Maj. Op. at 12838-39. But a sizeable body of Ninth Circuit case law suggests not only that State Department country reports are "the most important and perhaps the best source of information" on conditions in foreign nations, *Sowe*, 538 F.3d at 1285, but also that this court must *defer* to individualized findings by the IJ regarding "changed conditions" that are supported by the country reports, even where the relevant country reports contain contradictory information. *Id.* at 1286 (this court is not in a position to second-guess the IJ's construction of a "somewhat contradictory" country report). Indeed, "where the [IJ] rationally construes an ambiguous or somewhat contradictory country report and provides an individualized analysis of how changed conditions will affect the specific petitioner's situation, substantial evidence will support the agency determination." *Id.* (quoting *Gonzalez-Hernandez,* 336 F.3d at 1000). Thus, even if the contradictory portions of the country reports were weighty—which they are not—we would not be free to second-guess the IJ's findings to the extent they are based on those reports.

## IV.

In sum, when the portions of the two country reports dealing with the religious freedoms of Jehovah's Witnesses are read carefully and objectively, and viewed together with Kamalyan's testimony, it is clear that substantial evidence

---

[7]The statement quoted by the majority about Jehovah's Witnesses being "detain[ed]" comes from the introduction to the 2003 Human Rights Report and refers to Jehovah's Witnesses imprisoned for draft evasion in violation of Armenia's universal conscription laws prior to the enactment of a statute allowing for "alternative military service," which took effect on June 1, 2004, but had not yet been implemented at the time of Kamalyan's hearing. *See id.* at 1. There is no other reference in that report to unlawful detentions or any other type of abuse of Jehovah's Witnesses by the government for any other reason. At no time has Kamalyan claimed he was persecuted for refusing conscription; thus, these detentions are not germane to Kamalyan's asylum claim.

supports the IJ's finding of significant improvements in the conditions germane to Kamalyan's claim of a well-founded fear of future persecution. In addition, Kamalyan's testimony about recent events that made it "legal" to be a Jehovah's Witness, and the IJ's finding of a positive change in the ability of Armenian Jehovah's Witnesses to register as a religion, were *confirmed* in the 2005 Religious Freedom Report, where it was noted that, approximately one month before Kamalyan's asylum hearing, they had secured substantial religious freedoms by successfully completing the registration process. *Id.* at 1.

On this record, the majority's conclusion that the government did not carry its burden of proving a "fundamental change" in conditions for Jehovah's Witnesses in Armenia, and in particular for those who, like Kamalyan, were persecuted in the past for proselytizing, is simply not "compelled" by the evidence. I would deny the petition.