**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHANPREET KAUR,

*Petitioner*,

v.

ROBERT M. WILKINSON, Acting
Attorney General,

*Respondent.*

No. 18-73001

Agency No.
A213-086-008

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted January 22, 2021*
Pasadena, California

Filed January 29, 2021

Before: Kim McLane Wardlaw, Mary H. Murguia, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Wardlaw;
Dissent by Judge Miller

---

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

# SUMMARY[**]

### Immigration

The panel granted Chanpreet Kaur's petition for review of the Board of Immigration Appeals' denial of her applications for asylum and related relief, and remanded, holding that Kaur's credible testimony about an attempted gang rape was sufficient to establish past persecution, and that the Board erred in imposing evidentiary requirements of ongoing injury or treatment beyond the attempted sexual assault in order to show persecution.

The Board concluded that Kaur failed to establish past harm rising to the level of persecution, stating that although some forms of sexual assault short of rape can and do constitute persecution, Kaur's attempted gang rape could not rise to the level of persecution unless she produced evidence of treatment for psychological harm or further specific testimony regarding ongoing issues stemming from the attack. The panel held that the Board erred in requiring such additional evidence of harm, psychological or otherwise, explaining that attempted rape itself is a severe violation of bodily integrity and autonomy, and so is itself almost always a form of persecution. The panel noted that this court has consistently treated rape as one of the most severe forms of persecution, and explained that some forms of physical violence are so extreme that even *attempts* to commit them constitute persecution. The panel explained that in evaluating whether past treatment rises to the level of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

persecution, the appropriate inquiry looks not to the level of harm experienced by the petitioner, but rather whether the treatment the victim received rises to the level of persecution. In other words, it is the conduct of the persecutor, not the subjective suffering from the perspective of the victim, that matters for purposes of determining what constitutes persecution.

The panel held that Kaur's credible testimony about her attempted rape by a gang of Congress Party agents, in broad daylight on a public street, which left her bloodied and bruised and in need of medical treatment, was sufficient to establish past persecution. The panel noted that although this attack alone was sufficient to establish persecution, Kaur also endured death threats and her parents were attacked on multiple occasions, which under the totality of the circumstances, established past persecution on account of her political opinion.

The panel concluded that the Board also appeared to conduct the wrong analysis by focusing on whether the Indian government was unwilling or unable to protect Kaur from persecution, where Kaur alleged that she was persecuted by the government itself, and government control is not required where the persecutor is the government. The panel noted that the Congress Party was already a part of the government when party agents attempted to rape Kaur, it became the ruling party mere months later, and was in power when further persecutory acts occurred against Kaur and her family. The panel noted that the distinction between an "opposition party" and conceptions of who represents the "government" is nuanced in a multi-party parliamentary system such as India's, and becomes further strained in cases of parliamentary minority governments, where no party commands a majority of seats. However, the panel

emphasized that the Board neither mentioned that Kaur had claimed persecution by her government, nor did it discuss the record evidence and precedent supporting that claim. Noting that the Board is not free to ignore arguments raised before it, the panel remanded to the Board for further consideration of Kaur's claim that she was persecuted by government actors.

The panel stated that if on remand the Board concludes that Kaur's past persecution was at the hands of her government, the Board should apply the presumption of future persecution, and conduct an individualized analysis of whether the government can rebut this presumption by showing either a fundamental change in circumstances or that Kaur could avoid future persecution by relocating internally within India.

Dissenting, Judge Miller agreed with the panel that both rape and attempted rape can constitute persecution, that an asylum applicant should not bear a heightened evidentiary burden to show psychological harm resulting from sexual assault, including attempted rape, and that the harm Kaur suffered was sufficiently severe to be characterized as persecution. Agreeing that it can sometimes be difficult to identify which parties are part of the government in a multi-party parliamentary system, Judge Miller noted that at the time of her attempted rape, the Congress Party did not form the government either of India or of the state of Punjab, where Kaur lived, and that even if the Congress Party had been a part of the government at the time of the attack, the agency concluded there was no evidence that Kaur's attackers had any affiliation with the government, that they were working for anyone in the government, or that they had any official governmental title or authority. Judge Miller would deny the petition because, in his view, substantial

evidence supported the Board's determinations that Kaur's attackers were not part of the government and that the Indian government was not unable or unwilling to control them.

## COUNSEL

Douglas Jalaie, Los Angeles, California, for Petitioner.

Joseph H. Hunt, Assistant Attorney General; Anthony P. Nicastro, Assistant Director; Jonathan Robbins, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

WARDLAW, Circuit Judge:

Chanpreet Kaur, a native of the state of Punjab in India, seeks asylum for fear of persecution in her country of origin on account of her work for the Mann Party and advocacy for the independent Sikh state of Khalistan. At her removal proceedings, she testified credibly that, as a result of her political activities, a group of men from the Indian National Congress Party, one of Punjab's major political parties, accosted her while she was alone at her parents' store, dragged her into the public street, started ripping off her clothes and attempted to gang rape her. As a result of this assault, she suffered scrapes and facial bruising that required medical attention. This was not an isolated incident. Just months before this attack, agents of the Congress Party had threatened her while she was walking on the street. And just months after the attack, when Kaur left Punjab for Cyprus,

Congress Party agents threatened her by phone "that they wanted to kill her" and bring her "dead body back to India." Congress Party agents subsequently tracked down her father, asked him about her whereabouts, and beat him. The police later came to her parents' house, asked about her location, and beat both her father and mother when they told the police she was in the United States.

The Board of Immigration Appeals ("BIA") concluded that the attempted gang rape and death threats against Kaur, and the physical assault of her parents, was not a sufficient "amount of mistreatment" so as to constitute past persecution. Rather, the BIA reasoned that the attempted gang rape "did not rise to the level of persecution" because Kaur lacked evidence of "treatment for psychological harm," or other "ongoing issues" stemming from this assault.

The BIA erred in imposing evidentiary requirements of ongoing injury or treatment beyond the sexual assault itself in order to show persecution. Kaur's credible testimony about the attempted gang rape is sufficient to show persecution. Attempted rape by a gang of men, in broad daylight on a public street, is especially terrorizing because it powerfully demonstrates the perpetrator's domination, control over the victim and imperviousness to the law. Requiring evidence of additional harms both minimizes the gravity of the sexual assault and demeans the victim. We grant Kaur's petition for review and remand for further proceedings consistent with this opinion.

## I.

Kaur was born in Punjab, India in 1993. In February 2015, she joined the Shiromani Akali Dal Simranjeet Singh Mann Party ("Mann Party"), which advocates for the creation of Khalistan, a sovereign state for the Sikh people.

Mann Party members have faced persistent harassment, intimidation, threats, and violence in Punjab. *See, e.g.*, *Singh v. Whitaker*, 914 F.3d 654, 657 (9th Cir. 2019) (granting the petition for review of a Mann Party member who was jailed and severely beaten by the police on multiple occasions); *Singh v. Ashcroft*, 362 F.3d 1164, 1167–68 (9th Cir. 2004) (same).

Kaur's story is no exception. Kaur was first harassed by agents of the Congress Party, one of Punjab's major political parties, on account of her Mann Party membership in May 2016. Four Congress Party members on motorbikes accosted her in the street, cursed her, and told her that she would not "be able to show [her] face to the world" if she continued working for the Mann Party. Undeterred, Kaur continued her political activities.

Five months later, in October 2016, Kaur was working in her parents' shop when a group of male members of the Congress Party entered and asked her to find some items they wished to purchase. It was about 2:00 p.m. in the afternoon. When she brought the items to the counter, the men grabbed her arms, pulled her over the counter, and dragged her into the street. They slapped her, kicked her, yelled obscenities at her, and told her that they were doing this to her because she was a Mann Party member. The men started ripping off Kaur's clothing because, as Kaur stated, "they wanted to rape me." Her father was away at the time, and her mother, who has difficulty walking, was unable to come to her aid. Kaur cried out for help and some of her neighbors came to her rescue. Still, she suffered injuries during this attempted gang rape that required immediate treatment from a nearby doctor.

Soon thereafter, Kaur left Punjab for Cyprus. While she was there, in February 2017, she received several threatening

phone calls from Congress Party agents back in Punjab, including one in which the caller said that he was "going to kill [her]" and bring her "dead body back to India."

Roughly one month later, in March 2017, the Congress Party won elections in Punjab, and assumed power in the state.[1]  Over the following months, Kaur made her way to Mexico, ultimately crossing into the United States near the San Ysidro port of entry in September 2017.  She was almost immediately detained and charged as removable under 8 U.S.C. § 1182(a)(7)(A)(i), which renders an immigrant inadmissible for failing to possess a valid entry document at the time of applying for entry into the United States.

Even after Kaur was detained in the United States, her persecutors did not stop.  Kaur testified that, in February 2018, her father was severely beaten on the way home from his Sikh temple by Congress Party agents.  His assailants repeatedly asked Kaur's father if he knew where Kaur was located.  A month later, the police showed up at her father's door to ask about Kaur's whereabouts.  When Kaur's father explained that she was in the United States, the police thought he was lying and beat both him and Kaur's mother.

## II.

During her immigration proceedings, Kaur conceded removability and applied for asylum, humanitarian asylum, withholding of removal, and relief under the Convention Against Torture (CAT).  She claimed a well-founded fear of

---

[1] *See* Smita Gupta, *Congress Takes Heart From Victory in Punjab*, The Hindu (Mar. 11, 2017, 10:07 PM), https://tinyurl.com/yxrk9koc (last visited Aug. 21, 2020) (noting that the Congress Party had "wrest[ed]" back power "after a decade in the opposition" in Punjab).

future persecution by her government on account of her political opinion.

The Immigration Judge (IJ) found that Kaur testified credibly.[2]    However, the IJ rendered an oral decision rejecting Kaur's claim for relief on the basis that the attempted gang rape, death threats, and other harassment Kaur and her family had suffered did not constitute past persecution.    The IJ also concluded that Kaur had not demonstrated that the attempted rape and harassment were committed by the government or by actors the government was unable or unwilling to control.  In the alternative, the IJ concluded that even if Kaur had demonstrated past persecution, she had not demonstrated that she was unable to safely relocate within India to avoid future persecution. Finally, explaining that it was "4:15 in the afternoon" and therefore the court's time was limited, the IJ quickly dismissed Kaur's claims for withholding of removal and CAT relief.  Accordingly, the IJ ordered Kaur removed to India.

On appeal, the BIA affirmed the IJ's order of removal. The BIA denied Kaur's asylum request, reasoning that she had failed to establish past persecution because she did not supplement her credible testimony of attempted rape with additional evidence of treatment for psychological harm or of ongoing issues.  Skipping over Kaur's contention that she was persecuted by her government, the BIA also concluded that Kaur had not shown that the Indian government was unable or unwilling to control the individuals who had harassed, threatened, and attempted to rape her.  In the alternative, the BIA found that, even assuming Kaur had

---

[2] Although the IJ questioned the veracity of two affidavits in the record, she did not question the credibility of Kaur's testimony.

demonstrated past persecution, she had not met her burden of showing she could not safely relocate within India. The BIA likewise dismissed her claims for humanitarian asylum, withholding of removal, and CAT relief.

Kaur timely petitioned for review.

## III.

We have jurisdiction under 8 U.S.C. § 1252(a). Because the IJ found Kaur credible, her "statements must be taken as true." *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1171 (9th Cir. 2006). "Where the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Guerra v. Barr*, 951 F.3d 1128, 1132 (9th Cir. 2020) (quoting *Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012)). "[W]e review de novo both purely legal questions and mixed questions of law and fact." *Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1183 (9th Cir. 2020) (alteration in original) (quoting *Cordoba v. Holder*, 726 F.3d 1106, 1113 (9th Cir. 2013)). "Whether particular acts constitute persecution for asylum purposes is a legal question . . . review[ed] de novo." *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1088 (9th Cir. 2005) (emphasis removed). Only the "BIA's findings of fact [are reviewed] for substantial evidence." *Padilla-Martinez v. Holder*, 770 F.3d 825, 830 (9th Cir. 2014).

## IV.

To be eligible for asylum, Kaur must demonstrate that she "is unable or unwilling" to return to India "because of persecution or a well-founded fear of persecution on account of . . . [her] political opinion." 8 U.S.C. § 1101(a)(42)(A). If a petitioner demonstrates that she has suffered past

persecution, "then fear of future persecution is presumed." *Deloso v. Ashcroft*, 393 F.3d 858, 863 (9th Cir. 2005). To demonstrate past persecution, Kaur must establish that (1) her "treatment rises to the level of persecution;" (2) "the persecution was committed by the government, or by forces that the government was unable or unwilling to control" and (3) "the persecution was on account of one or more protected grounds," such as political opinion. *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc) (quoting *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010)).

It is uncontested that Kaur had suffered past physical abuse and death threats on account of her political opinion. However, the BIA concluded that she had failed to establish that the abuse and threats rose to the level of persecution or that it was "committed by the government, or by forces that the government was unable or unwilling to control." Each of these conclusions was marred by legal error, which we discuss in turn below.

A.

The BIA concluded that although some forms of "sexual assault short of rape can and do[] constitute persecution," the attempted gang rape could not rise to the level of persecution unless Kaur produced "evidence of treatment for psychological harm or further specific testimony regarding ongoing issues" stemming from the attack. But this is not the law. When a petitioner demonstrates that she has suffered an attempted rape, she need not adduce additional evidence of harm—psychological or otherwise—to establish past persecution. Attempted rape itself is a severe violation of bodily integrity and autonomy, and so is itself almost always a form of persecution.

"'Persecution is an extreme concept and has been defined as the infliction of suffering or harm . . . in a way regarded as offensive.'" *Guo v. Sessions*, 897 F.3d 1208, 1213 (9th Cir. 2018) (quoting *Gu v. Gonzales*, 454 F.3d 1014, 1019 (9th Cir. 2006)). The hallmarks of persecutory conduct include, but are not limited to, the violation of bodily integrity and bodily autonomy. *See Singh v. I.N.S.*, 134 F.3d 962, 967 (9th Cir. 1998) (explaining that persecution includes "bodily harm or a threat to life or liberty"). Thus, we have concluded that "'physical violence is persecution.'" *Ming Dai v. Sessions*, 884 F.3d 858, 870 (9th Cir. 2018) (quoting *Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009)).

We have consistently treated rape as one of the most severe forms of persecution an asylum-seeker can suffer. Rape and sexual violence have a long and tragic history as weapons of war.[3] They are often an "atrocious" form of physical violence. *See Garcia-Martinez*, 371 F.3d at 1072; *Lopez-Galarza v. I.N.S.*, 99 F.3d 954, 962 (9th Cir. 1996) ("Rape at the hands of government authorities while imprisoned on account of one's political views can be an atrocious form of punishment indeed."); *see also* Robin L.

---

[3] The historical use of rape and sexual violence as weapons of war is well-documented. *See* Kelly D. Askin, *Prosecuting Wartime Rape and Other Gender-Related Crimes Under International Law*, 21 Berkeley J. Int'l L. 288, 289–297 (2003). Sexual violence remains a widespread form of persecution today. *See Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1076 (9th Cir. 2004) (regarding the use of sexual violence as a form of persecution in Guatemala's civil war); Note, Emily R. Chertoff, *Prosecuting Gender-Based Persecution: The Islamic State at the ICC*, 126 Yale L.J. 1050, 1056–63 (2017) (discussing the use of sexual violence to persecute Yazidi women living in Iraq and Syria); Note, Marra Guttenplan, *Granting Asylum to Persecuted Afghan Western Women*, 12 Cardozo J.L. & Gender 391, 404–05 (2005) (discussing the use of sexual violence to persecute Afghan women).

West, *Legitimating the Illegitimate: A Comment on Beyond Rape*, 93 Colum. L. Rev. 1442, 1448 (1993) (calling rape a "spiritual murder"). Indeed, a persecutor uses sexual violence not only to violate the bodily integrity of the victim, but to gain "'power and control.'" *Garcia-Martinez*, 371 F.3d at 1076 (quoting Margaret A. Cain, *The Civil Rights Provision of the Violence Against Women Act*, 34 Tulsa L. J. 367, 407 n.32 (1999)); *see also Ali v. Ashcroft*, 394 F.3d 780, 787 (9th Cir. 2005) (explaining it is a "myth that rape is about sex instead of domination and control" (citation omitted)). Thus, in addition to being a highly offensive invasion of another's bodily integrity, rape violates our most treasured notions of bodily autonomy. *Cf. Furman v. Georgia*, 408 U.S. 238, 458 (1972) (Powell, J., dissenting) (noting that rape "is widely viewed as the most atrocious of intrusions upon the privacy and dignity of the victim").

Rape and other forms of sexual violence have a profound psychological impact on the victim. Sitting en banc, we have explained that rape's psychological effects are "'severe and long-lasting'" and include "'avoidance of situations that trigger memories of the violation, profound feelings of shame, [and] difficulty remembering events.'" *Bringas-Rodriguez*, 850 F.3d at 1070–71 (alteration in original) (quoting *Lopez-Galarza*, 99 F.3d at 962). In *Lopez-Galarza*, we surveyed the medical evidence regarding the psychological effect of rape, and noted that:

> The effects of rape appear to resemble the effects of torture. A recent article compared the psychological sequelae of rape survivors to the psychological distress endured by survivors of abuse constituting torture under international law, and concluded that the

> suffering of rape survivors is strikingly
> similar in intensity and duration to the
> suffering endured by torture survivors.

99 F.3d at 963 (quotation marks omitted) (citing Note, *Torture by Means of Rape*, 84 Georgetown L.J. 1913, 1931 (1996)).  The comparison between the psychological effects of rape and the psychological effects of torture is telling.  We have elsewhere explained that "torture is *per se* disproportionately harsh; it is inherently and impermissibly severe; and it is *a fortiori* conduct that reaches the level of persecution."[4]  *Nuru v. Gonzales*, 404 F.3d 1207, 1225 (9th Cir. 2005).  Thus, rape's physical and psychological effects are equivalent to the most severe horrors inflicted upon asylum seekers.

We have also explained that some forms of physical violence are so extreme that even *attempts* to commit them constitute persecution.  Indeed, we have held that attempted murder constitutes persecution.  *Lopez v. Ashcroft*, 366 F.3d 799, 803 (9th Cir. 2004); *Madrigal v. Holder*, 716 F.3d 499, 504 n.2 (9th Cir. 2013) ("[M]urder attempts constitute persecution." (citing *Lopez*, 366 F.3d at 803)); *see also Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1233 (11th Cir. 2007) ("Put simply, attempted murder is persecution." (citing *Deloso*, 393 F.3d at 860)).  In fact, because murder is perhaps the ultimate threat to bodily integrity, "[i]n certain [] cases, we have held that . . . death

---

[4] In *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1069 (9th Cir. 2006), the dissent characterized a petitioner's description of one past incident of abuse as "*attempted* torture," but declined to state whether the dissenting judge would consider that event persecution.  Otherwise, to the best of our knowledge, neither our court nor any of our sister circuits have issued a precedential opinion regarding whether "attempted torture" constitutes persecution.

*threats* can constitute a primary part of a past persecution claim." *Lim v. I.N.S.*, 224 F.3d 929, 936 (9th Cir. 2000) (emphasis added). Similarly, because kidnapping involves the extreme loss of bodily autonomy, attempted kidnapping can constitute persecution. *See Arteaga v. I.N.S.*, 836 F.2d 1227, 1231–32 (9th Cir. 1988), *abrogated on other grounds by I.N.S. v. Elias-Zacarias*, 502 U.S. 478 (1992) (noting that the petitioner was "threatened with kidnapping or conscription," and that because "[f]orced recruitment by a revolutionary army is tantamount to kidnapping," this attempted kidnapping constitutes persecution); *see also Sangha v. I.N.S.*, 103 F.3d 1482, 1487 (9th Cir. 1997) (citing *Arteaga*, 836 F.2d at 1232, in holding that an attempt to forcibly conscript the petitioner, tantamount to attempted kidnapping, constitutes persecution).[5]

Similar to attempted murder and attempted kidnapping, attempted rape almost always constitutes persecution.[6]

---

[5] In *Elias-Zacarias*, the Supreme Court explained that when a petitioner resists forced recruitment into a guerilla organization, that fact alone does not demonstrate that the attempted forced recruitment was on account of the petitioner's political opinion. 502 U.S. at 483–84. However, even after *Elias-Zacarias*, we have continued to hold that attempted kidnapping constitutes persecution. *Sangha*, 103 F.3d at 1487.

[6] We do not purport to fully define the boundaries of attempted rape and persecution or any space that may exist between the concepts, other than to acknowledge that they are not coterminous. Future cases may illustrate circumstances where (1) a substantial step towards attempted rape is present but (2) that substantial step is not so "extreme" or "severe" as to constitute persecution. *See Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995). For example, one can imagine a situation where a likely persecutor is apprehended or otherwise prevented from committing rape while en route to the location where he expects the intended victim to be. Such a circumstance may constitute a substantial step toward attempted rape yet fail to create any possible imminency of danger that is

Attempted rape, like rape itself, carries the hallmarks of persecutory conduct. As our sister circuits have recognized, attempted rape violates notions of bodily autonomy almost as much as rape itself. For example, in *Nakibuka v. Gonzales*, the Seventh Circuit considered the asylum claim of a Ugandan woman who had been attacked by government soldiers. 421 F.3d 473, 476–77 (7th Cir. 2005). During the course of this attack, one of the soldiers had "unzipped his pants and threatened to rape" the woman. *Id.* at 475. Although the IJ had rejected the petitioner's asylum claim in part by "minimiz[ing]" this attempted rape, the Seventh Circuit explained:

> [W]e are unwilling to dismiss so casually a threat of imminent rape. The threatened rape was one way for the soldiers to express their domination and control over [the petitioner], as well as a way to send a message to [her] about what might happen if [she did not stop her political activities].

*Id.* at 477 (first citing *Ali*, 394 F.3d at 787; and then citing *Lopez-Galarza*, 99 F.3d at 959, for the proposition that "rape

---

sufficiently "extreme" or "severe" so as to also constitute persecution. *Id*. However, we are not convinced that an attempted rape by a gang of men, who go so far as to arrive where they reasonably expect the intended victim to be, in order to suppress the intended victim's political opinion, will fail to constitute persecution merely because the intended victim was miraculously absent. We would not categorically diminish such a horrific and potentially imminent assault as less than "extreme" or "severe." *Id*.

is a form of persecution if done on account of [the] victim's actual or imputed political opinion").**[7]**

Similarly, in *Uwais v. U.S. Attorney General*, the Second Circuit considered the asylum application of a petitioner whom a police officer had attempted to rape during civil strife in Sri Lanka. 478 F.3d 513, 516 (2d Cir. 2007). The BIA had rejected her claim, concluding that the attempted rape was the result of sexual desire and not persecutory intent. *Id.* at 518. In response, the Second Circuit explained that the attempted rape in that case could not be viewed as "simply a criminal act," *id.* (quoting *Garcia-Martinez*, 371 F.3d at 1072), in part because "sexual violence in the context of civil strife is often not about sex, but instead about domination, intimidation, and control," *id.* (citing *Ali*, 394 F.3d at 787). Accordingly, the Second Circuit remanded to the BIA to consider whether the attempted rape constituted past persecution on account of the petitioner's political opinion. *Id.* at 519. Thus, the decisions of the Second and Seventh Circuits support our conclusion that because attempted rape is itself a violation of the autonomy of the victim, it can form the basis of a claim to past persecution itself.

Furthermore, as this case demonstrates, attempted rape is almost always a form of sexual assault. The Model Penal Code defines sexual assault as nonconsensual or offensive sexual contact.**[8]** *Sexual Assault*, Model Penal Code § 213.4;

---

**[7]** In *Nakibuka*, the Seventh Circuit did not reach, as we do here, how attempted rape is almost always a form of sexual assault, which we have held constitutes persecution. *See Lopez-Galarza*, 99 F.3d at 959.

**[8]** In relevant part, the Model Penal Code defines one who commits a sexual assault as "[a] person who has sexual contact with another not his spouse, or causes such other to have sexual contact with him, is guilty

*see also Angoucheva v. I.N.S.*, 106 F.3d 781, 786 (7th Cir. 1997) (equating "attempted rape" and "sexual assault" for purposes of analyzing a petitioner's claim to past persecution). The attempted gang rape of Kaur—with many men ripping at her clothes in order to force themselves on her—falls squarely within this definition. When discussing rape as a form of persecution, we have consistently been careful to note that sexual assault short of rape constitutes persecution as well. *See Lopez-Galarza*, 99 F.3d at 959 (listing both rape and sexual assault as forms of persecution); *Shoafera v. I.N.S.*, 228 F.3d 1070, 1074 (9th Cir. 2000) (same); *see also Haider v. Holder*, 595 F.3d 276, 288 (6th Cir. 2010) (noting that "sexual humiliation," combined with other lesser forms of maltreatment, can constitute persecution). This reflects our understanding that violence that is sexual in nature assaults the body and tortures the mind in a manner so severe that it can constitute an "atrocious" form of persecution. *See Garcia-Martinez*, 371 F.3d at 1072.

Sexual assault is more than just a violation of bodily autonomy. Just as rape's severe psychological effects include shame and a clouded memory, *Bringas-Rodriguez*, 850 F.3d at 1071, sexual assault's psychological effects include "self-blame, a pervasive feeling of loss of control, and memory loss or distortion." United Nations High Commissioner for Refugees (UNHCR), *Guidelines on the Protection of Refugee Women*, ¶ 72, (July 1991)[9]; *see also*

---

of sexual assault, a misdemeanor, if . . . he knows that the contact is offensive to the other person. . . . Sexual contact is any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire." § 213.4.

[9] https://tinyurl.com/y66tghgm (last visited Aug. 21, 2020).

UNHCR, *Handbook for the Protection of Women and Girls*, 5.3.1.1 (2008) (noting that "sexual and gender-based violence" of all forms leads to "emotional and psychological trauma")[10]; *cf. Bringas-Rodriguez*, 850 F.3d at 1071 (relying on UNHCR guidelines to understand the effects of sexual violence). Because attempted rape is a form of sexual assault, and sexual assault is a form of persecution, attempted rape also constitutes a form of persecution.[11] The BIA committed legal error by requiring Kaur to produce additional evidence of ongoing trauma or psychological treatment to establish a claim to past persecution on account of attempted rape. When evaluating whether a petitioner has been persecuted "on account of" a protected ground, we examine the persecutor's motive, not the victim's perspective. *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014) (citing *Elias-Zacarias*, 502 U.S. at 483). Similarly, in evaluating whether past treatment rises to the level of persecution, we do not look to the level of harm experienced by the petitioner. Rather, "[t]he operative question is 'whether . . . the *treatment* [the victim] received rises to the level of persecution.'" *Mihalev v. Ashcroft*, 388 F.3d 722, 729 (9th Cir. 2004) (emphasis added) (quoting *Gormley v. Ashcroft*, 364 F.3d 1172, 1176–77 (9th Cir. 2004)). In other words, it is the conduct of the persecutor, not the subjective suffering from the perspective of the victim, that matters for purposes of determining what constitutes persecution. *See Nuru*, 404 F.3d at 1225 (torture

---

[10] https://tinyurl.com/y2mnlw39 (last visited Aug. 21, 2020).

[11] The dissent does not contest the fact that attempted rape almost always constitutes sexual assault, which we have recognized can amount to persecution. *Lopez-Galarza*, 99 F.3d at 959. The BIA acknowledged as much in this very case, stating that "sexual assault short of rape can and does constitute persecution."

is "a fortiori *conduct* that reaches the level of persecution" (emphases altered)); *see also Madrigal v. Holder*, 716 F.3d 499, 505 (9th Cir. 2013) (examining the persecutors' "course of conduct"). The degree or manifestation of the psychological harm endured by Kaur, or any other survivor of attempted rape, is therefore legally irrelevant to determining whether her attempted rape constituted persecution.

The BIA's requirement of demonstrating additional or ongoing psychological harm makes little practical sense as well. Just like rape, attempted rape inflicts serious psychological wounds.[12] *See* Susan Reese et al., *Lifetime Prevalence of Gender-Based Violence in Women and the Relationship With Mental Disorders and Psychosocial Function*, 306 J. Am. Med. Ass'n 513, 513 (2011) (studying the correlation between all forms of gender-based violence, including attempted rape, and long-lasting mental health concerns); Kirsten Johnson et al., *Association of Sexual Violence and Human Rights Violations With Physical and Mental Health in Territories of the Eastern Democratic Republic of the Congo*, 304 J. Am. Med. Ass'n 553, 559 (2010) (studying the effects of sexual violence, including attempted rape, in a conflict zone). Because the psychological harm of an attempted rape is inherent in the

---

[12] In *Gilaj v. Gonzales*, 408 F.3d 275, 286 (6th Cir. 2005), the Sixth Circuit considered the case of a petitioner who had suffered repeated police harassment, including one attempted act of sexual violence. In concluding that the BIA wrongly denied her asylum claim, the Sixth Circuit explained that this attempted act of sexual violence, coupled with the other significant instances of police harassment, was evidence that the petitioner had been "targeted by her government for physical and psychological abuse." *Id.* at 287. Thus, the Sixth Circuit has also recognized the psychological impact that an attempted rape can have when coupled with other persecutory conduct.

act itself, there is no need to require asylum seekers—many of whom have limited resources—to gather and produce evidence of ongoing psychological harm or treatment to supplement their claims.[13] *Cf. Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004) (noting that conduct aimed at causing severe "emotional or psychological" harm constitutes persecution).

In light of the foregoing, there can be little question that the attempted rape of Kaur rises to the level of persecution. A group of Congress Party agents—all men—dragged her into the street and ripped off her clothes with the intent of raping her. If not for Kaur's successful cries for help, she would have been the victim of a gang rape. Even so, this attack left her bloodied and bruised, and in need of medical treatment. This attack alone is enough to constitute persecution, and the BIA erred by diminishing this serious sexual violence and insisting that Kaur produce evidence of additional or ongoing harms.

Furthermore, that Kaur suffered past persecution is plain on the record before us. In addition to the attempted gang rape, Kaur endured death threats and her parents were attacked on multiple occasions. Death threats alone can constitute persecution, *Lim*, 224 F.3d at 936, and "[v]iolence

---

[13] The Government appears to suggest that even if we conclude that a petitioner who has suffered an attempted rape need not produce additional evidence of long lasting psychological harm in order to establish past persecution, we should still require the petitioner to show that the attempted rape required serious medical attention at some point. We decline to adopt this rule. For the reasons stated in this opinion, an attempted rape that involves only minimal physical contact is still an extreme threat to a person's bodily autonomy that inflicts psychological wounds. In any event, Kaur suffered injuries during her attempted rape that did require the attention of a medical doctor.

directed against . . . family members provides support for a claim of persecution and in some instances is sufficient to establish persecution," *Baballah v. Ashcroft*, 367 F.3d 1067, 1074–75 (9th Cir. 2004); *see also Mashiri*, 383 F.3d at 1120. Looking to the "totality of the circumstances," *Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir. 2004), Kaur has "suffered [past] persecution" on account of her political opinion, *Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1315 (9th Cir. 2012).**[14]**

## B.

We next turn to the BIA's legally erroneous understanding of who persecuted Kaur. To establish past

---

**[14]** The Government cites five cases to suggest that Kaur's past treatment does not rise to the level of past persecution. However, none of the cases cited by the Government involved an attempted rape by a mob of men, resulting in injuries that required medical treatment. *See Prasad v. I.N.S.*, 47 F.3d 336, 339 (9th Cir. 1995) (no past persecution where petitioner was "placed in a jail cell" for "four to six hours" during which, "[a]t some point, [petitioner] was hit on his stomach and kicked from behind" and petitioner "did not require medical treatment"); *Halim v. Holder*, 590 F.3d 971, 975–76 (9th Cir. 2009) (no past persecution where petitioner was subject to repeated discrimination and suffered one incident in which he was beaten by a mob); *Wakkary v. Holder*, 558 F.3d 1049, 1059–60 (9th Cir. 2009) (no past persecution where petitioner was beaten by youths when he was in his teens and was once threatened by a mob); *Gu*, 454 F.3d at 1017–18 (no past persecution where petitioner was hit ten times with a rod "but required no medical treatment"); *Lanza v. Ashcroft*, 389 F.3d 917, 934 (9th Cir. 2004) (no past persecution where petitioner was "pushed, punched," and otherwise threatened); *Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (no past persecution because, even though the petitioner had endured non-sexual violence, the violence was not officially sponsored). Thus, each of these cases is distinguishable. In any event, a petitioner's failure to "seek medical treatment for the [injury] suffered is hardly the touchstone of whether [the harm] amounted to persecution." *Lopez*, 366 F.3d at 803.

persecution, Kaur must show that her "persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Bringas-Rodriguez*, 850 F.3d at 1062 (quoting *Baghdasaryan*, 592 F.3d at 1023). Kaur claimed that she was the victim of persecution by the government itself. For example, Kaur repeatedly told the IJ that she was afraid of the "Congress government" and its agents because her attackers were agents of "the Congress government."[15] These statements referred to the Indian National Congress Party, one of India's major political parties and one of the leading parties in Punjab. *See* Encyc. Britannica, *Indian National Congress Party* (discussing the national dominance of the Congress Party in the latter half of the Twentieth Century, and its continued dominance in the north and northeastern regions of India, where Punjab is located).[16] In her brief before the BIA, Kaur also emphasized that she was the victim of persecution by "government actors," explaining that "the members of the Congress Party who harmed Respondent were working on behalf of their party, [and] on behalf of those members who work for the government."

The administrative record reflects that when Kaur's persecution began, the Congress Party was already part of the government in Punjab: it held 46 out of 117 seats in the state legislature and was a key opposition party with the

---

[15] Early in her testimony, Kaur identified her persecutors as "the people of the Congress government." Later, the following exchange took place between Kaur and her attorney:

> Attorney: Who were harassing you?

> Kaur: The Congress was.

[16] https://tinyurl.com/y85z2lkl (last visited Aug. 21, 2020).

ability to shape laws and exert influence over the civil service.  The Congress Party became the ruling party in the state of Punjab in March 2017, mere months after Congress Party agents attempted to gang rape Kaur, telling her that they were doing this to her because she was "working for the Mann Party" and "not supporting [the Congress Party] in any way."  Thus, some of the more severe forms of Kaur's persecution occurred during the Congress Party's electoral rise.  Furthermore, the last known persecutory event against Kaur and her family occurred in 2018, a full year *after* the Congress Party's electoral victory made it the official head of the state government.  Finally, from the time Kaur appeared before the IJ through the present, the Congress Party has remained the leader of the Punjab government.  *See* Government of Punjab India, *Chief Minister* (listing as Chief Minister, Amarinder Singh, who was elected to that position in March 2017).[17]

In *Reyes-Guerrero v. I.N.S.*, 192 F.3d 1241, 1243 (9th Cir. 1999), we found that the petitioner was able to establish past persecution in a situation analogous to Kaur's. Although the source of the petitioner's persecution was not directly at issue there, we treated persecution by members of Colombia's Liberal Party—a party that rose from a minority member of the national legislature to the ruling party during the course of the petitioner's persecution—as if the government itself were the persecutor.[18]  *See id.* at 1243–44

---

[17] https://tinyurl.com/yxrpvz65 (last visited Aug. 21, 2020).

[18] It is also notable that, during the course of his persecution, the petitioner in *Reyes-Guerrero* requested, and received, protection from the national government.  192 F.3d at 1243.  The Government claims that Kaur did not try hard enough to request assistance from local police, and so the BIA was correct in concluding that the government of India might have protected her from her persecutors.  However, as *Reyes-Guerrero*

(describing persecution inflicted on the petitioner from 1984 until 1991); Eduardo Dargent & Paula Muñoz, *Democracy Against Parties? Party System Deinstitutionalization in Colombia*, 3 J. Pol. Latin Am. 43, 51 (2011) (describing the Liberal Party's election to national power in 1986). As *Reyes-Guerrero* shows, when a petitioner suffers persecution at the hands of a major political party both during and after its rise to power from a minority voting bloc in the legislature to the head of government, the source of the persecution is the government itself.

In *Reyes-Guerrero*, we assumed that the petitioner had suffered past persecution even though, as here, members of an opposition party were the perpetrators of the persecutory acts. 192 F.3d at 1246. We did not address whether the government was unable or unwilling to control the opposition party members. *Id.* *Reyes*-Guerrero does not stand alone. We had previously held that an asylum petitioner demonstrated past persecution for his political opinion based on testimony that, among other things, he "was shot at by opposition party members and narrowly missed death the last time he visited [his home country]." *Ajayi v. I.N.S.*, 962 F.2d 13 (Table), at *4 (9th Cir. 1992).

In rejecting Kaur's claim to past persecution, the BIA neither mentioned that Kaur had claimed persecution by her government, nor did it discuss the record evidence[19] and

shows, even if Kaur had requested and received assistance from the police, the source of her persecution was nevertheless the government itself.

[19] Kaur's credible testimony about the attempted gang rape in broad daylight on a public street itself demonstrates that the Congress Party members acted with impunity. An inference can be drawn that the Congress Party members who attacked her thought they were the "law."

precedent supporting this claim. Instead, it faulted her for failing to show that the government was unable or unwilling to control her persecutors.[20] But when a petitioner credibly asserts that her persecutor is the government itself, she is not required to show that the persecutor cannot be controlled. *See Jahed v. I.N.S.*, 356 F.3d 991, 1000 (9th Cir. 2004); *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 (9th Cir. 2004) (holding that "when the government is responsible for persecution, the third prong of our asylum inquiry is satisfied without further analysis" into whether the government was "unable or unwilling" to control the persecutors). It therefore appears that the BIA conducted the wrong analysis. Furthermore, "'[t]he BIA is not free to ignore arguments raised by a petitioner.'" *Barroso v. Gonzales*, 429 F.3d 1195, 1208 (9th Cir. 2005) (alterations removed) (quoting *Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005)). Rather than "guess" at the BIA's rationale for rejecting Kaur's claim that she was persecuted by government actors—if it had one—we remand for further consideration of this argument. *Recinos de Leon v. Gonzales*, 400 F.3d 1185, 1194 (9th Cir.2005) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)).

The dissent fails to consider the complexity of multi-party parliamentary systems such as India's (and Punjab's in particular).[21] The analysis becomes further strained in cases

---

[20] Because the BIA did not even address Kaur's contention that she was persecuted by the government, it merely assumed that the Congress Party members who attacked her were "private citizens," contrary to the dissent's argument, Dissent at 32. Accordingly, the BIA is not entitled to substantial evidence review on this point. *Barroso v. Gonzales*, 429 F.3d 1195, 1208 (9th Cir. 2005).

[21] For example, a minor party that receives no more than 10% of a legislature's seats may nonetheless form a coalition with a larger party

of parliamentary minority governments, where *no* party commands a majority of seats (nor can any coalition be formed), and the caretaker government must rely on the support of other parties on an ad hoc basis. *See, e.g.*, Ellen Manning, *General election 2019: What is a minority government?*, Yahoo News (Nov. 25, 2019).[22] Under such a system, the dissent's approach would make it hard to argue that *any* party truly forms the "government" as defined by a working majority.[23] In sum, the distinction between an

---

to form a working governmental majority, or even less than 1% for some parties in India's current governing coalition. *See, e.g.*, Rakesh Mohan Chaturvedi, *BJP, JDU, LJP finalise 17:17:6 seat sharing formula for Bihar Lok Sabha polls*, The Economic Times (Dec. 24, 2018), https://tinyurl.com/y8buh6g9 (last accessed Oct. 14, 2020) (noting that one party joined now Prime Minister Narendra Modi's governing coalition despite winning only 3 seats out of the 543 in India's lower house). Such a party may command *far* less support from the population and boast *far* fewer legislators than a larger party that is not a part of the governing coalition, but, under the dissent's view, the actions of the smaller party's members may be described as those of the government whereas members of the potentially far larger party would be dismissed as merely "private actors."

[22] https://tinyurl.com/y3veorje (last accessed Oct. 14, 2020).

[23] That is to say nothing of less formal arrangements that are occasionally made. For example, after the United Kingdom's general election in 2017, the Conservative Party formed such a minority government after entering into a "confidence and supply" agreement with the Democratic Unionist Party ("DUP") whereby the latter agreed to support the former on various pieces of legislation in exchange for certain concessions. *Conservatives agree pact with DUP to support May government*, BBC News (June 26, 2017), https://tinyurl.com/y6as7unw (last accessed Oct. 14, 2020). While not formally a part of the governing coalition, the DUP clearly provided necessary support for the Conservatives, but the dissent's approach would nonetheless decline to see any persecutory conduct by DUP members as even possibly those of the "government."

"opposition party" and conceptions of who represents the "government" is considerably more nuanced than the dissent suggests.[24]

Furthermore, the dissent fails to account for the fact that a persecutory act against Kaur and her family took place a year *after* the Congress Party came to power in Punjab, and it seems to miss the point that the BIA never addressed Kaur's claim that she was persecuted by government actors at all. When the BIA considers this claim, as we direct on remand, it should consider the totality of the persecutory acts against her, including those where it was undisputed that the Congress party controlled the government in Punjab.

## V.

If, on remand, the BIA concludes that Kaur's past persecution was at the hands of her government, she will be

---

[24] India's long history of pogroms against political or ethnic minorities by party mobs or paramilitaries with the tacit, or in some cases explicit, approval of local and national government officials, which continues to the present day, is hardly comparable to American democratic processes and its two-party system. *See* Dissent at 34–35; *see also*, *e.g.*, Samanth Subramanian, *How Hindu supremacists are tearing India Apart*, The Guardian (Feb. 20, 2020), https://tinyurl.com/vyfgz9k (last accessed Dec. 7, 2020); Shreeya Sinha and Mark Suppes, *Timeline of the Riots in Modi's Gujarat*, NY Times (Apr. 4, 2014), https://tinyurl.com/y3kn3xat (last accessed Dec. 7, 2020). There is even a tradition, as demonstrated in this very case, of politically sanctioned mob violence specifically by Congress Party-affiliated groups against groups advocating for an independent Sikh state of Khalistan. Akhilesh Pillalamarri, *India's Anti-Sikh Riots, 30 Years On*, The Diplomat (Oct. 31, 2014), https://tinyurl.com/y2tjwhot (last accessed Dec. 7, 2020) (noting that "[b]etween October 31 and November 3, 1984, over 8,000 Sikhs were murdered in riots organized and supported by numerous members of India's then-ruling Congress Party").

presumed to have a fear of future persecution. *Deloso*, 393 F.3d at 863. The BIA must then determine whether the government can rebut this presumption by showing either a fundamental change in circumstance or that Kaur "could avoid future persecution by relocating" internally within India.[25] *Id.* at 864 (quoting 8 C.F.R. §§ 208.13(b)(1)(i), (ii)).

In the prior proceedings, the BIA concluded that even if Kaur had demonstrated past persecution, she had not carried her burden of "show[ing] that she could not safely relocate within India." At the time, the BIA did not have the benefit of our recent decision in *Singh v. Whitaker*, in which we emphasized that once a petitioner establishes past persecution, "the burden is on the government" to show that the petitioner "can reasonably relocate internally." 914 F.3d at 659. Furthermore, *Singh* explained that the BIA must conduct an "individualized analysis" to determine whether relocation is possible. *Id.* at 661. That analysis must take account of the "persons or entities that caused the past persecution," "the nature and extent of the persecution" suffered by Kaur, and any "future political activities" by Kaur.[26] *Id.* Thus, on remand, the BIA should conduct a thorough, individualized analysis of Kaur's ability to

---

[25] Because the BIA's rejection of Kaur's applications for withholding of removal, humanitarian asylum, and CAT relief depended to some extent on the two legal errors discussed above, we likewise grant the petition as to these claims and remand for further proceedings on an open record.

[26] In justifying its conclusion that Kaur could safely relocate in India, the BIA offered only a single sentence stating that Kaur "fears a few men from her local area, and the record does not establish that she has an objectively reasonable fear of harm from these men elsewhere in India."

relocate internally, placing the burden on the government as required under *Singh*.

**PETITION GRANTED; REMANDED.**

---

MILLER, Circuit Judge, dissenting:

Chanpreet Kaur seeks to establish eligibility for asylum on the basis of past persecution. In the court's evaluation of that claim, there is much with which I agree. I agree that both rape and attempted rape can constitute persecution. *Cf. Akosung v. Barr*, 970 F.3d 1095, 1105 (9th Cir. 2020). I agree that an asylum applicant should not bear a heightened evidentiary burden to show psychological harm resulting from sexual assault, including attempted rape. And I agree that the harm Kaur suffered was sufficiently severe to be characterized as persecution.

But to constitute "persecution" as that term is used in asylum law, suffering or harm must have been "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (B.I.A. 1985); *accord Rahimzadeh v. Holder*, 613 F.3d 916, 920 (9th Cir. 2010). No matter how severe it may be, purely private violence does not constitute persecution unless the government is unable or unwilling to control it. The Board of Immigration Appeals determined that Kaur's attackers were not part of the government and that the government was not unable or unwilling to control them. Because substantial evidence supports that finding, I would deny the petition for review.

Kaur cites several incidents as past persecution, but by far the most serious is the attempted rape that took place in October 2016. The other incidents consisted of threats to Kaur or attacks on other members of her family, rather than violence directed at her. The Board determined that those other incidents did not constitute past persecution, and the court does not suggest that they would compel a grant of relief by themselves. The case therefore turns on the October 2016 attack, so, like the court, I will focus on it.

Kaur testified that she was attacked by a group of men whom she described as "members of the Congress party" who objected to her membership in a rival political party. At the time, the Congress Party did not form the government either of India or of the state of Punjab, where Kaur lived. The immigration judge found "insufficient evidence to show that [Kaur's attackers] had any affiliation with the government, that they were working for anyone in the government or that they had any official governmental title or authority." The immigration judge also determined that the men appeared to be "afraid that [Kaur] would report them to police or have them prosecuted in local court," demonstrating that "the government does, in fact, arrest perpetrators or that prosecutors charge perpetrators with crimes in such incidents." The Board affirmed the immigration judge's findings that Kaur had not shown the requisite governmental involvement.

Kaur now claims that she was persecuted directly by the government. The Board cannot be faulted for not addressing that claim more directly because even under a generous reading of Kaur's brief to the Board, she presented it only obliquely. The focus of her argument before the Board was not that her attackers were part of the government, but rather that they were persons whom the government was unable or

unwilling to control. Indeed, she presented her entire discussion of the issue under the heading "IJ erred in holding that the Respondent had not demonstrated that the government was unwilling or unable to control the source of the persecution." The Board addressed that argument, concluding that Kaur "did not establish that the government of India would be unwilling or unable to protect her," and explaining that she "did not report the incidents to the police or establish that such reporting would be futile." The Board reached that conclusion based on Kaur's testimony that her attackers could have faced consequences in "a local city court" if Kaur had reported them.

To be sure, Kaur did assert that "the members of the Congress Party who harmed [her] were working on behalf of their party, on behalf of those members who work for the government." But the immigration judge made a directly contrary finding, determining that Kaur had not shown that the men had "any affiliation with the government [or] that they were working for anyone in the government." The Board endorsed that finding, stating that "[t]he men who attacked [Kaur] were private citizens." That statement by the Board was not offered simply in passing; it formed a key part of the Board's reasoning.

The Board's finding should be sufficient to resolve this case. We may set aside the agency's factual findings only if they are not supported by substantial evidence—that is, only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *accord INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). For two reasons, the record does not compel a contrary conclusion.

First, at the time of the attack, the Congress Party was an opposition party; it did not form the government. It is true that the Congress Party later formed the government in

Punjab. But while the subsequent electoral fortunes of a party may be relevant to the likelihood of *future* persecution, they do not establish that the already completed attack— committed by men who at the time were private actors— must be deemed *past* persecution by the government.

Our decision in *Reyes-Guerrero v. INS*, 192 F.3d 1241 (9th Cir. 1999), is not to the contrary. That case involved a Colombian prosecutor who had received death threats for investigating "crimes committed by high ranking members of the opposition." *Id.* at 1246. But the only issue we addressed was whether the harm the petitioner had suffered was inflicted on account of his political opinion. *Id.* at 1245– 46. We did not consider the source of the petitioner's harm, whether directly or indirectly. That is not to say that *Reyes-Guerrero* was wrongly decided—in light of the then-ongoing civil war in Colombia, if we had considered the issue, it would not have been difficult to conclude that the Colombian government was unable to control violence by private actors, including opposition political parties. *See Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 668–69 (7th Cir. 2005). Indeed, we noted that Reyes-Guerrero "requested and was provided protection by the national security agency," yet he continued to receive death threats anyway. *Reyes-Guerrero*, 192 F.3d at 1243–44. We did not hold that violence or threats of violence by an opposition party are necessarily attributable to the government. Until today, no court has read our decision to establish that proposition.

Our decision in *Ajayi v. INS*, 962 F.2d 13 (9th Cir. 1992) (unpublished table decision), is similarly unhelpful to Kaur. The statement in that case that the petitioner had been "shot at by opposition party members" in Nigeria does appear to have described events that occurred before the governing regime was "ejected from power by a military coup." *Id.* at

*4. But our decision made clear that the reason the petitioner had a well-founded fear of persecution was because the new Nigerian government had "acted . . . to target [his] family members for persecution and reprisal." *Id.* The case thus involved future persecution by a government, not past persecution by an opposition party. (The government might have made this point in its brief, but it was unable to do so because our rules prohibit litigants from citing unpublished dispositions from before 2007, such as *Ajayi*. Ninth Cir. R. 36-3(c). It is contrary to fundamental principles of due process to base our decisions on authorities that we have designated as nonprecedential and forbidden the parties to address.)

I fully agree that it can sometimes be difficult to identify which parties are part of the government in a multi-party parliamentary system. But the complexity of foreign political systems is hardly a reason for us to set aside the Board's judgment and assume for ourselves the responsibility of deciding who constituted the government of Punjab in October 2016. It is the function of the Executive Branch, not the courts, to determine which entity to recognize as the government of a foreign country. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14–16 (2015). That function is a striking example of how the administration of the immigration laws can involve "especially sensitive political functions that implicate questions of foreign relations"—questions that we are poorly equipped to answer. *INS v. Abudu*, 485 U.S. 94, 110 (1988).

Second, even if the Congress Party had been part of the Punjabi government in October 2016, it would not follow that every action taken by every member of the party was an action of the government. In the United States, for example, the Democratic Party and the Republican Party may each, at

various times, hold a majority in one House of Congress and therefore form part of the government, but no one would say that every action taken by a member of one of those two parties is attributable to the United States Government. Kaur's attackers may have been members of the Congress Party, but as the immigration judge explained, there is no evidence that they "had any affiliation with the government, that they were working for anyone in the government or that they had any official governmental title or authority." In the Board's words, "[t]he men who attacked [Kaur] were private citizens."

Substantial evidence supports the Board's determination that the harm Kaur suffered was not inflicted by the government or by forces the government was unable or unwilling to control. On that basis, I would deny the petition for review.